# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 22, 2024

Lyle W. Cayce
Clerk

———————

No. 23-20030

———————

Catalyst Strategic Advisors, L.L.C.,

*Plaintiff—Appellee*,

*versus*

Three Diamond Capital SBC, L.L.C., *formerly known as* Contractors Building Supply Company, L.L.C.,

*Defendant—Appellant*.

———————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:21-CV-2905

———————————————————

Before Stewart, Dennis, and Wilson, *Circuit Judges*.

Cory T. Wilson, *Circuit Judge*:

This case presents a straightforward question: Is Plaintiff-Appellee Catalyst Strategic Advisors, L.L.C. (Catalyst) entitled to a commission for its role promoting the sale of its former client?  The district court said yes and ruled for Catalyst after determining basic principles of contract interpretation compelled that result.  Seeking reconsideration, Defendant-Appellant Three Diamond Capital SBC, L.L.C., formerly known as Contractors Building Supply Company, L.L.C. (CBS), argued for the application of Texas's procuring cause doctrine, but the district court rejected CBS's argument

because that common law doctrine was displaced by the parties' contract. We affirm the district court's rulings.

## I.

Catalyst is a consulting firm that advises companies on mergers, acquisitions, business sales, and divestitures. During the relevant period, CBS was an equipment rental company based in Houston, Texas. CBS enlisted Catalyst to help with an "enterprise-wide" sale of its company in 2017, and the parties executed an agreement memorializing the terms of their relationship. But in October 2018, CBS decided to stop pursuing an enterprise-wide sale and terminated the agreement. Nevertheless, the two companies maintained a working relationship.

In 2019, CBS again sought an enterprise-wide sale. So it contacted Catalyst, and they executed a second engagement letter (the Engagement Letter). The Engagement Letter provided that CBS would pay Catalyst a quarterly "Advisory Service Fee" of $25,000, with the possibility of a separately calculated "Advisory Completion Fee" that would be earned "upon the closing of . . . a Transaction." A "Transaction" was defined as a deal "involving a merger or the sale of all or substantially all the stock, membership interests or assets of [CBS]."

Importantly, the Engagement Letter provided that Catalyst would be entitled to the Advisory Completion Fee "for any Transaction . . . completed during the period from the date of this [Engagement Letter] until eighteen (18) months after the date of termination of this Engagement." The Engagement Letter also included a non-exclusivity provision allowing Catalyst to take on other clients and permitting CBS to work with other brokers, "provided . . . that any such strategic or financial advisor will not participate in any portion of any Advisory Service Fee or Advisory

Completion Fee payable to Catalyst with respect to ongoing services or any Transaction."

After finalizing the Engagement Letter, Catalyst contacted several potential buyers on behalf of CBS, including Herc Rentals (Herc). Catalyst discussed a sale of CBS with Herc for several months, but Herc eventually declined. Then, due to the onset of the COVID-19 pandemic in March 2020, CBS terminated the Engagement Letter, effective May 30, 2020. In its termination memorandum, CBS explained that Catalyst had "done a great job," and that "[t]he termination of the Engagement is not a reflection of any dissatisfaction on our part."

After the rental industry recovered, the CEO of CBS renewed discussions with Herc's CEO in April 2021. This time, Herc agreed to purchase CBS for approximately $190.3 million. The deal closed on August 30, 2021. CBS refused to pay Catalyst the Advisory Completion Fee even though the transaction took place less than eighteen months after CBS terminated its Engagement Letter with Catalyst. Catalyst sued CBS for breach of contract.

After discovery, the parties cross-moved for summary judgment. The district court determined that Catalyst substantially performed its obligations to CBS and that the unambiguous language of the Engagement Letter required CBS to pay Catalyst the Advisory Completion Fee for any transaction that closed within the eighteen-month tail period. The district court therefore found that CBS breached the Engagement Letter and granted summary judgment in Catalyst's favor.

CBS then filed a motion for reconsideration and a renewed motion for summary judgment, both premised on its proposed application of the procuring cause doctrine under Texas law. Although the district court noted that CBS failed to raise its procuring cause argument earlier, the court

nonetheless reached the merits of the issue. It found that the procuring cause doctrine did not govern the Engagement Letter because the terms of the contract displaced the doctrine. Consequently, the district court denied both of CBS's motions, and awarded Catalyst $3,839,693 in damages, plus 5% prejudgment interest. CBS timely appealed.

## II.

"We review grants of summary judgment *de novo*, applying the same standard as the district court." *In re La. Crawfish Producers*, 852 F.3d 456, 462 (5th Cir. 2017) (citing *Templet v. HydroChem Inc.*, 367 F.3d 473, 477 (5th Cir. 2004)). Specifically, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"Typically, we review a district court's decision on a Rule 59 motion to reconsider for abuse of discretion." *La. Crawfish*, 852 F.3d at 462 (citing *Templet*, 367 F.3d at 477). However, "[t]he applicable standard of review of the denial of the [movant's] motion to . . . reconsider is dependent on whether the district court considered the materials attached to the [movant's] motion, which were not previously provided to the court." *Templet*, 367 F.3d at 477 (citing *Ford Motor Credit Co. v. Bright*, 34 F.3d 322, 324 (5th Cir. 1994)). "If the materials were considered . . . and the district court still grants summary judgment, the appropriate appellate standard of review is *de novo*." *Id.* (citing *Ford Motor Credit Co.*, 34 F.3d at 324); *see also Am. Elec. Power Co. v. Affiliated FM Ins. Co.*, 556 F.3d 282, 287 (5th Cir. 2009) (same).

No. 23-20030

## III.

We begin by (A) considering the procuring cause doctrine and determine that it is displaced here.[1]  Next, we (B) analyze the terms of the Engagement Letter and readily conclude that it mandates Catalyst's recovery of the Advisory Completion Fee.  CBS's counterarguments prove unavailing.

## A.

In Texas, the procuring cause doctrine is "a 'settled and plain' rule." *Perthuis v. Baylor Miraca Genetics Lab'ys, LLC*, 645 S.W.3d 228, 234 (Tex. 2022) (citation omitted).  The function of the procuring cause doctrine "is to credit a broker (or salesman, or other agent) for a commission-generating sale when 'a purchaser [was] produced through [the broker's] efforts, ready, able and willing to buy the property upon the contract terms.'"  *Id.* (alterations original) (citation omitted).  "Under this doctrine, the broker's entitlement to a commission vests on his having *procured* the sale, not on his actual involvement in a sale's execution or continued employment through the final consummation of the sale."  *Id.* at 234–35.

Three questions dictate the application of the procuring cause doctrine:

---

[1] Catalyst asserts that CBS twice forfeited its procuring cause argument:  first, by failing to raise it at summary judgment, and second, by failing to argue against forfeiture in its opening brief on appeal.  While these undisputed lapses might normally prove fatal, new arguments raised in motions for reconsideration are preserved for appeal if the district court addresses their merits.  *Am. Elec. Power Co.*, 556 F.3d at 287 (reviewing an issue raised for the first time at reconsideration because the district court considered the merits); *see also Murchison Cap. Partners, L.P. v. Nuance Commc'ns, Inc.*, 625 F. App'x 617, 621–22 (5th Cir. 2015) (same).  Because the district court considered CBS's procuring cause argument, it is preserved, and CBS had no need to argue against forfeiture in its opening brief.  Thus, we proceed to the merits.

> First, did the parties have the kind of contractual relationship to which the procuring-cause doctrine applies? If so, did the parties displace the doctrine by the terms of their contractual agreement? Finally, if the procuring-cause doctrine applies to the parties' dispute and was not displaced, to what extent does the doctrine impose liability for the specific commission payments that the plaintiff demands?

*Id.* at 234. The Supreme Court of Texas has emphasized that "[t]he doctrine provides nothing more than a default, which applies only when a valid agreement to pay a commission does not address questions like how a commission is realized or whether the right to a commission extends to sales closed after the brokerage relationship ends." *Id.*

The second question of displacement is especially relevant because "Texas strongly favors parties' freedom of contract." *Waste Mgmt. of Tex., Inc. v. Stevenson*, 622 S.W.3d 273, 286 (Tex. 2021) (quoting *Gym-N-I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912 (Tex. 2007)). Indeed, the procuring cause doctrine "is just a manifestation of [Texas courts'] larger refusal to countenance any effort by parties to override the authoritative constructions of contracts." *Perthuis*, 645 S.W.3d at 236. Therefore, "[w]hen a contract prescribes otherwise-valid binding terms for how to handle post-termination commissions, . . . the courts will enforce them. Contractual silence, however, leaves the procuring-cause doctrine intact as to those contracts to which the doctrine applies." *Id.* at 237.

In *Perthuis*, the arguments for displacing the procuring cause doctrine depended on two provisions: an at-will employment provision and a net sales provision. *Id.* at 238–39. The Supreme Court of Texas determined that the former provision did not affect the broker's compensation, while the latter simply established a generic commission-based compensation structure. *Id.*

at 239. Thus, the court concluded that the procuring cause doctrine was not displaced. *Id.* at 237–41.

By comparison, the Engagement Letter contains a robust accounting of Catalyst's fees, including provisions for interim fees, various gradations of completion fees, and the conditions under which those fees might be earned. The parties also articulated their own terms for whether Catalyst could collect an Advisory Completion Fee after the contract was terminated. While the precise meaning of the Engagement Letter may be subject to interpretation, the parties clearly spoke on these issues—far from the "[c]ontractual silence" that the Supreme Court of Texas encountered in *Perthuis*. *Id.* at 237.

Nevertheless, CBS argues that the non-exclusivity provision of the Engagement Letter mandates the application of the procuring cause doctrine. According to CBS, the general rule in Texas is that non-exclusive brokers must be the procuring cause of a transaction to recover a commission. *See, e.g.*, *English v. Marr*, 506 S.W.2d 333, 336 (Tex. Civ. App. 1974). However, the procuring cause doctrine "does not restrict parties' ability to modify their contractual relationships" by substituting their own preferences in place of the common law. *Perthuis*, 645 S.W.3d at 235. So even if CBS correctly articulates Texas law on this point, the parties supplanted the general rule with their own contract terms. Thus, while we must still analyze the impact of the non-exclusivity provision as a matter of contract interpretation, we do not view that provision as triggering the application of the procuring cause doctrine.

Because the Engagement Letter addresses "questions like how a commission is realized" and "whether the right to a commission extends to sales closed after the brokerage relationship ends," the "default" common law procuring cause doctrine is displaced by the language of the contract. *Id.*

at 234. The district court correctly reached that same conclusion in rejecting CBS's arguments on reconsideration. Accordingly, we proceed to interpret the terms of the Engagement Letter.

## B.

### 1.

Under Texas law, "[w]hen a contract's meaning is disputed, our primary objective is to ascertain and give effect to the parties' intent as expressed in the instrument." *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018) (citing *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005)). "We give contract terms their plain and ordinary meaning unless the instrument indicates the parties intended a different meaning." *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009) (citing *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)). "For contracts involving commissions, all the usual 'rules of construction' apply, like the familiar presumptions favoring consistent usage, disfavoring surplusage, and using the plain meaning of undefined terms." *Perthuis*, 645 S.W.3d at 236 (citing *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 892–93 (Tex. 2017)).

The language of the Engagement Letter governing the term of the parties' contract states:

> Upon any termination of this Engagement by the Company, Client will be obligated to pay Catalyst the Advisory Completion Fee . . . for any Transaction that is completed during the period from the date of this letter until eighteen (18) months after the date of termination of this Engagement.

The operative terms of that provision are defined elsewhere in the contract. "Company" and "Client" are defined as CBS, "Transaction" is defined as "a merger or the sale of all or substantially all the stock, membership interests

or assets of the Company," and in this context, "Advisory Completion Fee" is defined as the commission earned by Catalyst upon the closing of "any Transaction . . . [worth] $50 million or more." These operative provisions are clear.[2]

Based on the language of the Engagement Letter, Herc's purchase of CBS constituted a "Transaction." And by CBS's own telling, Catalyst fulfilled its end of the bargain by "[doing] a great job in representing the interests of CBS for the scope of services for this Engagement." It is also undisputed that CBS terminated the Engagement Letter approximately fifteen months before the business's sale to Herc closed on August 30, 2021. Further, it is undisputed that Herc purchased CBS for approximately $190.3 million. Thus, as the district court determined, Catalyst is entitled to the Advisory Completion Fee based on the plain language of the Engagement Letter.

**2.**

CBS advances one contractual and one equitable counterargument to this conclusion. Both fail.

First, CBS contends that the terms of the Engagement Letter, irrespective of the procuring cause doctrine, required Catalyst to procure a sale in order to earn the Advisory Completion Fee. And true enough, Catalyst did not even know about the sale until shortly before it was

---

[2] The parties spar over whether a redline version of their 2017 agreement should be considered as evidence of the drafters' intent and whether the district court improperly consulted that disputed evidence. Because the terms of the Engagement Letter are unambiguous, there is no need to consult extrinsic evidence of 2017 contract negotiations. Further, the district court's decision expressly "did not rely on" the 2017 redlines, so we see no reason to wade into Texas law regarding parol evidence that—according to the Supreme Court of Texas—"remains susceptible to confusion and inconsistency." *URI*, 543 S.W.3d at 757.

consummated.  But while the Advisory Completion Fee was triggered by a sale, it was *earned* as "compensation for Catalyst performing the Advisory Services."

This interpretation is supported throughout the Engagement Letter. For example, section M of the Engagement Letter includes an acknowledgment that Catalyst offers no guarantee of success and that "the payment of any of the fees or expenses shall not be contingent upon the successful completion of a Transaction, but shall be due and payable as set forth herein."  In other words, CBS owed the fees and expenses contemplated by the Engagement Letter to Catalyst for performing the promised services, regardless of whether Catalyst itself completed a sale of the business.

This language is echoed in the non-exclusivity provision of the Engagement Letter.  That section explicitly contemplates CBS obtaining brokerage services from other sources, but it ensures "that any such strategic or financial advisor will not participate in any portion of any Advisory Service Fee or Advisory Completion Fee payable to Catalyst with respect to ongoing services or any Transaction."  This makes clear that Catalyst was to receive the full Advisory Completion Fee even if a Transaction was ultimately secured through a third party.

Further, Catalyst's entitlement to the Advisory Completion fee expressly survived eighteen months beyond the end of the parties' agreement.  CBS was "obligated to pay Catalyst the Advisory Completion Fee . . . for any Transaction . . . completed during the period from the date of this [Engagement Letter] until eighteen (18) months after the date of termination . . . ."  Again, this language demonstrates that Catalyst was to receive an Advisory Completion Fee even for a deal it did not close. Accordingly, the text of the Engagement Letter does not permit CBS's

interpretation that Catalyst must have procured a Transaction to receive the Advisory Completion Fee.

Next, CBS contends that awarding Catalyst the Advisory Completion Fee impermissibly rewrites the Engagement Letter to award Catalyst an inequitable windfall. While "courts cannot rewrite the parties' contract or add to or subtract from its language," *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 242 (Tex. 2016), granting Catalyst the Advisory Completion Fee does not run afoul of this directive. On the contrary, denying Catalyst its Advisory Completion Fee would require rewriting the plain language of the contract.

CBS asserts that Catalyst was fairly compensated for its efforts through the Advisory Service Fees that CBS paid, totaling $150,000, and that the $3,839,693 commission awarded to Catalyst by the district court constituted a windfall. This reasoning appears premised on the erroneous notion that the Advisory Service Fee and the Advisory Completion Fee were mutually exclusive forms of compensation under the Engagement Letter. But that theory is not borne out in the contract; the Engagement Letter provides that "[a]ny Advisory Service Fees paid in eighteen (18) months immediately prior to a Transaction . . . will be credited towards the Advisory Completion Fee." This fee structure set by the parties clearly contemplates the Advisory Completion Fee being paid in addition to Advisory Service Fees paid outside that eighteen-month window. And because Texas law demands that "courts must examine the entire agreement and give effect to each provision so that none is rendered meaningless," the Engagement Letter's two-tiered compensation structure must be enforced. *Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015) (quoting *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011)).

As for the fairness of this structure, the Supreme Court of Texas has encouraged courts to avoid contract constructions that are "unreasonable,

inequitable, and oppressive." *Frost Nat. Bank v. L & F Distributors, Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam) (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)). However, "[t]he principle of freedom of contract requires us to recognize that 'sophisticated parties have broad latitude in defining the terms of their business relationship.'" *Sundown Energy LP v. HJSA No. 3, Ltd. P'ship*, 622 S.W.3d 884, 889 (Tex. 2021) (quoting *FPL Energy, LLC v. TXU Portfolio Mgmt. Co.*, 426 S.W.3d 59, 67 (Tex. 2014)), *reh'g denied* (June 11, 2021). More specifically, "the [procuring cause] doctrine imposes no substantive limits [on contract formation]. Parties remain free to structure commission agreements as they choose." *Perthuis*, 645 S.W.3d at 236. These principles reveal that contracts between sophisticated parties do not become less binding or inequitable simply because they involve the negotiated payment of large sums. When a court enforces the terms of such a contract, as here, it promotes certainty and fairness, not windfalls.

But even if we considered the equities, they favor Catalyst. After all, Catalyst prepared detailed business information to help present CBS to buyers and increase its market value, Catalyst introduced CBS to Herc, and Catalyst engaged in preliminary discussions with Herc about buying CBS. These efforts prompted CBS to note that Catalyst had "done a great job in representing the interests of CBS." Moreover, the eighteen-month tail period at issue in this dispute was no surprise to CBS. In fact, CBS considered delaying the sale to Herc by a few months just to ensure that Catalyst did not get its fee. Finally, the $3,839,693 fee Catalyst stands to receive is proportional to the $190.3 million sale price of CBS. Thus, the district court did not inequitably rewrite the contract on Catalyst's behalf; it merely held the parties to their agreed-upon terms.

No. 23-20030

\* \* \*

Having resolved the merits in Catalyst's favor, one final matter demands attention. In its briefing, Catalyst requests permission to seek appellate attorney's fees through a subsequent motion in this court. "Although we have the authority to award such fees, '[o]ur preferred procedure is to remand for the determination of the amount of such an award.'" *Zimmerman v. City of Austin, Texas*, 969 F.3d 564, 571 (5th Cir. 2020) (alteration original) (quoting *Marston v. Red River Levee and Drainage Dist.*, 632 F.2d 466, 468 (5th Cir. 1980)). We follow that course and leave the narrow issue of whether to award appellate attorney's fees to the sound discretion of the district court.

## IV.

For the reasons stated, the procuring cause doctrine is displaced by the clear terms of the parties' agreement. And the parties' Engagement Letter plainly entitles Catalyst to an Advisory Completion Fee for the sale of CBS to Herc, as the district court properly concluded. We remand only for the district court's consideration of an award of appellate attorney's fees.

AFFIRMED; and REMANDED.