*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-CV-0422

MP PPH, LLC, APPELLANT,

V.

DISTRICT OF COLUMBIA, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2021-CA-002209-B)

(Hon. Neal E. Kravitz, Motions Judge)

*Vernon W. Johnson, III*, with whom *Kathryn Bonorchis* was on the briefs, for appellant.

*Marcella Coburn*, Assistant Attorney General, with whom *Brian L. Schwalb*, Attorney General for the District of Columbia, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Graham E. Phillips*, Deputy Solicitor General, were on the brief, for appellee.

*Katherine Shea*, on behalf of *Legal Aid DC* as *amicus curiae*, supporting appellee. *Jonathan H. Levy* and *Alec Sandler* were on the brief.

(Argued January 14, 2025                    Decided July 17, 2025)

Before EASTERLY, HOWARD, and SHANKER, *Associate Judges*.

SHANKER, *Associate Judge*: In the order that prompted this appeal, the trial court found appellant MP PPH, LLC—the owner of the Marbury Plaza apartment

complex in southeast Washington, D.C.—in contempt for failing to comply with a consent order designed to remedy appalling conditions within the complex. As a remedy for MP PPH's contempt, the trial court ordered a 50% rent abatement for all tenants in the complex, retroactive to the latest possible date by which MP PPH had agreed to complete the consent order's requirements. It was "now time," said the trial court, for "the residents of Marbury Plaza to take priority."

MP PPH asks us to set aside the trial court's contempt finding and choice of sanction, contending that the trial court erred in numerous respects. We decline this request. MP PPH has forfeited many of the challenges it raises on appeal. And those that remain do not warrant reversal—the evidence of MP PPH's contempt is overwhelming, our precedent does not require the three-step contempt process that MP PPH argues was flouted by the trial court, the trial court's sanctions did not interfere with the discretion of courts presiding over related cases, and any improper reference by the trial court to the wealth of MP PPH's principal was harmless. We therefore affirm.

## I.     Factual and Procedural Background

We first describe the events that motivated appellee's (the District of Columbia) lawsuit, the contempt proceedings that led to this interlocutory appeal,

and MP PPH's efforts to stay the contempt sanctions ordered by the trial court.  We then summarize MP PPH's related bankruptcy proceedings.

### A.    The District's Lawsuit

In the summer of 2021, the District sued the owner (MP PPH) and property manager (Vantage Management, Inc.)[1] of Marbury Plaza—a nine-building, 674-unit apartment complex located east of the Anacostia River.  According to the District, after MP PPH acquired Marbury Plaza in 2015, it and Vantage allowed the property to fall into disrepair, leading to hundreds of housing code violations such as "pest infestations," "mold," "broken air conditioning," "lack of heat," "unsecured doors," "leaks," and "major plumbing issues."  Indeed, as an example, a licensed mold inspector retained by the District, after inspecting fifteen units and ten common areas, "found mold in every unit and common area inspected."  Despite these issues, alleged the District, the defendants advertised the complex as offering an "exceptional . . . living experience," the "best high-rise living in Southeast Washington D.C.," and "comfortable living."

---

[1] The initial complaint named only these two defendants.  The District would later file an amended complaint (the operative complaint at the time this appeal was filed), naming Dr. Anthony Pilavas—the owner and principal officer of MP PPH, LLC—as an additional defendant.  The District, however, did not move to hold Dr. Pilavas in contempt for violation of the consent order.

In addition to seeking to place the property in receivership, the District accused the defendants of violating the District's Consumer Protection Procedures Act (CPPA), D.C. Code §§ 28-3901 to -3913, by (1) affirmatively and implicitly misrepresenting the condition of Marbury Plaza to tenants, (2) failing to inform tenants that it would not remedy the conditions of the property, and (3) violating provisions of the District's Housing Code, *see* 16 D.C.M.R. § 3305, and Human Rights Act, D.C. Code §§ 2-1401.01 to -1404.04, both of which are incorporated into the CPPA by way of D.C. Code § 28-3904. As a remedy for those CPPA violations, the District sought restitution of the rent amounts charged to tenants, civil penalties, attorney's fees, and costs.

## B. Contempt Proceedings

Soon after the District filed its lawsuit, it moved for a preliminary injunction compelling MP PPH "to conduct full property assessments for mold, plumbing, HVAC, elevators, electricals, and general property safety assessments," share those assessments with the District, and "relocate affected tenants." Although MP PPH initially opposed the District's motion, it and the District ultimately filed a consent order to resolve the District's motion for a preliminary injunction.

In that order, MP PPH agreed to, among other actions, provide pest control services in all of Marbury Plaza's units and certain common areas monthly for at

least six months, with services commencing within thirty days of the order's effective date. It also agreed to, within thirty days, hire licensed professionals to conduct full assessments of Marbury Plaza's plumbing, HVAC systems, elevators, chairlifts, and exterior lighting. And it promised to assess "all living units" and "common areas" for "mold," "electrical hazards," and "fire and safety hazards."

MP PPH also faced further deadlines down the line. For instance, it committed to resolving all notices of infraction issued by the District and repairing all laundry facilities within sixty days; completing mold remediation within ninety days; and completing remediation of plumbing, HVAC, elevator, chairlift, electrical, and fire/safety issues within 120 days. In essence, MP PPH committed itself to "expeditiously and fully fund" a substantial facelift of Marbury Plaza.

MP PPH, the District, and the trial court discussed the consent order during a January 28, 2022, hearing, at which the court stated, "[W]ithout any objection I will [enter the consent order.]" The parties' and the court's subsequent statements at that hearing indicate that they understood the order's effective date to be January 28: counsel for MP PPH noted that the "order has literally just been entered" and the trial court stated that "Paragraph three seems to address [thirty] days of the effective date, *which is today*." The trial court issued a written order granting the parties' motion for entry of the consent order on March 2, 2022.

Approximately two months after the entry of the consent order, the District asked the trial court to adjudicate MP PPH in civil contempt, contending that MP PPH had failed to "complete the exterminations and assessments required within the first [thirty] days after the entry of the order." Seven months later, the trial court denied the motion in a written order, reasoning that "the District had not shown by clear and convincing evidence that MP PPH failed to make good faith efforts to complete the requisite exterminations and assessments."

On January 5, 2023—eleven months after the court orally entered the consent order—the District filed a renewed motion for an order finding MP PPH in contempt. This time, the trial court held a three-day evidentiary hearing, directed the parties to file closing briefs containing their final arguments and proposed remedies, and then heard closing arguments from the parties. And in late April 2023, the trial court granted the District's motion, finding that MP PPH had engaged in "extensive noncompliance."

The trial court began with the consent order's mold-assessment requirement. As of the date that the District filed its renewed motion for contempt, the trial court explained, MP PPH had assessed only 285 of the complex's 674 units for mold. And by the date of the evidentiary hearing, seventy-two units and all of the complex's common areas were yet to be assessed. Moreover, the trial court found that

MP PPH's already-completed inspections were insufficient, as they were "'visual' only" and therefore likely missed mold lurking behind drywall or otherwise hidden from view. In the trial court's view, these insufficient inspections occurred because MP PPH "became concerned about the cost of the mold remediation," even though MP PPH had agreed to fully fund the activities mandated by the consent order.

Regarding the consent order's mold-remediation requirement, the trial court found that MP PPH had remediated only 4.5% of Marbury Plaza's units by April 28, 2022—three months from the date of oral entry of the consent order. And by the date of the renewed motion, MP PPH had remediated only 18% of units— remediations that, the trial court reiterated, were based on insufficient, "visual only" inspections. The trial court rejected MP PPH's argument that its noncompliance was caused by tenants refusing access to units, stating that "the evidence showed that delays caused by tenant access issues explain at most a tiny fraction of MP PPH's noncompliance."

MP PPH also, per the trial court, failed to "have a licensed professional conduct a full assessment of all plumbing in the complex, including water infiltration and water heating issues and any necessary drywall repair." Although MP PPH provided evidence of three purported inspections, the first did "not include full assessments of water heating or drywall issues" and was not conducted by "licensed

plumbers"; the second was a "one-day survey" limited to a visual inspection of pipes not contained within occupied units;[2] and the third was limited to "ad hoc plumbing work" and therefore did not qualify as a full assessment. Absent a full assessment, the trial court explained, MP PPH necessarily failed to remediate all plumbing issues that a full assessment would have revealed. And the trial court rejected MP PPH's argument that a full replacement of the hot water system was unfeasible, explaining that MP PPH not only had refused to complete a full overhaul, but also had not "made any meaningful efforts to address the plumbing problems in the complex."

Turning to the order's requirement that MP PPH remediate specific units identified as problematic by District inspectors, the court found that because MP PPH did not begin the required repairs until the filing of the District's renewed motion for contempt, it had violated the consent order. With respect to MP PPH's attempted defense that tenants were denying it access, the court noted that "MP PPH has not provided any information about steps it has taken to obtain access to the other units since it began reporting in March 2022 that the tenants in those units had denied access to its contractors."

---

[2] MP PPH also argued that these first two inspections satisfied the order's requirement of a full HVAC system assessment, but the trial court rejected that argument, explaining that it failed for the same reasons that it failed with respect to the plumbing assessment.

The list goes on. The trial court found that MP PPH violated the consent order's requirement as to laundry facilities—MP PPH left one high-rise building's laundry facilities out of service for more than a year because it refused to pay for the repairs itself, instead awaiting the resolution of a dispute with its insurer. It determined that MP PPH failed to timely make the swimming pool available, as residents testified that the pool was available for only one week in the summer of 2022. It pointed out that MP PPH had conceded that it did not begin providing extermination treatments until the District filed its renewed motion for contempt. It rejected MP PPH's impossibility defense with respect to timely repair of the elevators, relying on testimony from MP PPH's elevator contractor that MP PPH could have accomplished the job faster by paying overtime or bringing in another company. And finally, it explained that because MP PPH had ignored a contractor's recommendation that it replace the wheelchair lift, MP PPH had not complied with the consent order's wheelchair-lift provisions despite its suggestion that residents had broken the lift after it had been repaired.

Underlying each of the above violations, in the trial court's view, was MP PPH's failure to "expeditiously and fully fund all repairs" as required by the consent order. The trial court pointed out that MP PPH repeatedly declined to pay its contractors and "cut corners whenever possible," expressing displeasure that

Dr. Pilavas had testified that "residents of Marbury Plaza should be grateful for the funds he has invested in the property."

Given the "magnitude and longstanding nature of [MP PPH's] violations," the court adjudicated MP PPH in civil contempt of the consent order. It then turned to the question of remedies. The District had requested a $5,000 fine "for each day [MP PPH] is not in full compliance with the Consent Order" and an escalating series of across-the-board rent reductions—10% after sixty days of continued noncompliance, 30% after ninety days, and 50% plus the appointment of a receiver after 120 days. In response, MP PPH argued that the District's proposed daily fine was improper, as any contempt sanctions should "go to the tenants" rather than the District. And it reiterated, "If the Court grants the District any monetary relief, the Owner requests that it be for the benefit of the Property and tenants, *not* the District." Nowhere in its brief addressing sanctions did MP PPH argue that the court could not order compensatory sanctions for tenants without hearing individualized, tenant-by-tenant evidence of harm.[3] And when the trial court asked the District during closing arguments whether rent reductions would have to be prospective only, MP PPH

---

[3] MP PPH pointed out that "the District only called three (3) tenants during the evidentiary hearing." But it did so only to argue that the District had not provided clear and convincing evidence of contempt.

neither offered any objection to that suggestion nor argued against it during its closing.

Ultimately, the trial court determined "that the best way to coerce MP PPH's compliance with the consent order and, at the same time, to compensate the victims of MP PPH's noncompliance is to order an across-the-board rent abatement for all tenants of Marbury Plaza retroactive to June 1, 2022." It set a baseline rent reduction of 50% to compensate complex residents for "pervasive mold, floods, leaks, and insect and rodent infestations, along with the malfunctioning plumbing and HVAC systems and the broken elevators and wheelchair lift." That reduction would increase to 60% 120 days after the court's entry of its order, and to 75% 180 days afterwards. In addition, the trial court required MP PPH to pay the District's attorney's fees and update its filings in "pending case[s]" to reflect the ordered rent credits.

In setting forth these sanctions, the trial court noted MP PPH's contention that "it is in a precarious financial condition and that costly sanctions will unfairly punish the Pilavases and may prevent them from making the repairs required by the consent order."[4] The trial rejected this argument, reasoning:

---

[4] In saying "the Pilavases," the trial court was referring to Dr. Pilavas and his wife, Helen Pilavas—MP PPH's two members.

> The record is clear . . . that the Pilavases have extensive real estate holdings—totaling more than 1,500 residential units and more than [forty] office suites in at least three states and the District of Columbia—and that they have repeatedly moved more than $10 million in and out of MP PPH, seemingly whenever doing so advanced their investment purposes.

It therefore declined to impose lesser sanctions.

## C.     Stay, Reconsideration, and Appeal

MP PPH asked the trial court to stay and reconsider its ruling, contending, for the first time, that (1) contempt sanctions could not be paid to nonparties and (2) the court could not order an across-the-board rent reduction without making individualized findings of harm for each of Marbury Plaza's approximately 2,500 residents.  The trial court denied both the stay and the reconsideration motion without engaging with MP PPH's new arguments.

MP PPH then filed an appeal from the trial court's contempt order and the trial court's order denying its motions for stay and reconsideration.  It also asked this court to issue the stay that the trial court had denied.  This court likewise declined MP PPH's stay request and subsequently denied MP PPH's motion for rehearing and rehearing en banc of that decision.

### D. Bankruptcy

While this appeal remained pending, MP PPH filed a voluntary petition for bankruptcy in the United States Bankruptcy Court for the District of Columbia. The bankruptcy court then stayed the contempt order's rent abatement from December 1, 2023, going forward. And just before argument in this case, MP PPH sold, through the bankruptcy process, Marbury Plaza to Clear Investment Group, LLC (CIG). As part of this sale, MP PPH, CIG, the District, a committee of tenant creditors, and a committee of unsecured creditors reached a global settlement, through which MP PPH did not retain "any claims or causes of action against current or former tenants" and assigned claims for past-due rent to CIG—who is not a party to this appeal.

### II. Analysis

We first address whether, in light of MP PPH's bankruptcy and sale of Marbury Plaza, this case is moot. Concluding that it is not, we, after setting forth our standard of review, address the District's contention that MP PPH has forfeited many of the claims of error it now advances. As we agree with the District in large

part, we go on to reach the merits of only those arguments that MP PPH preserved for our review.

Ultimately, we reject each of MP PPH's preserved arguments and affirm the trial court's contempt order. The evidence of MP PPH's contempt was staggering, the trial court was not required to give MP PPH a further opportunity to come into compliance before imposing sanctions, the trial court's sanctions did not interfere with the discretion of courts presiding over related landlord-tenant cases, and any improper reference by the trial court to Dr. Pilavas's wealth was harmless.

## A. Mootness

One day before oral argument in this case, the District filed a letter suggesting that MP PPH's sale of Marbury Plaza "calls into question what redress this appeal could provide for MP PPH." The District explained, relying on MP PPH's release of claims against tenants in its Bankruptcy Settlement, that "it is not clear to the District how [vacating the trial court's rent abatement] could result in MP PPH recouping any money."

The District's argument was vacillant, we think all would agree. So we ordered supplemental briefing on the question of mootness. And all parties and amicus Legal Aid DC responded that the case is not moot, explaining that if this

court were to hold that the trial court erred by finding MP PPH in contempt, it could order the District to return its award of contempt-related attorney's fees.

We agree with the parties. "Although not bound strictly by the case or controversy requirements of Article III of the United States Constitution, this court does not normally decide moot cases"—i.e., cases in which the court "can provide no effective relief." *Thorn v. Walker*, 912 A.2d 1192, 1195 (D.C. 2006) (citation modified). "But if there is a potentially available remedy, it does not need to be fully satisfactory to avoid mootness," as "even the availability of a partial remedy is sufficient to prevent a case from being moot." *Re'ese Adbarat Debre Selam Kidest Mariam Ethiopian Orthodox Tewahedo Church, Inc. v. Habte*, 300 A.3d 784, 794-95 (D.C. 2023) (citation modified). The return of attorney's fees constitutes just such a partial remedy, and it is within the trial court's power to order such a return. *See Buzz Barton & Assocs. v. Giannone*, 483 N.E.2d 1271, 1275 (Ill. 1985) (explaining that "if a party has received benefits from an erroneous decree or judgment," it must, after reversal, "restor[e] any benefit received from the erroneous judgment or decree"). So, this case is not moot.

### B.     Standard of Review

To the extent MP PPH has preserved its challenges, we review the trial court's contempt and reconsideration rulings for abuse of discretion. *See D.D. v. M.T.*, 550

A.2d 37, 44 (D.C. 1988) ("The decision whether to hold a party in civil contempt is confided to the sound discretion of the trial judge, and will be reversed on appeal only upon a clear showing of abuse of discretion."); *In re Est. of Derricotte*, 885 A.2d 320, 324 (D.C. 2005) ("[W]e review a trial court's decision to grant a Rule 59(e) motion for reconsideration for abuse of discretion."); *cf. Salazar ex rel. Salazar v. District of Columbia*, 602 F.3d 431, 441 (D.C. Cir. 2010) ("This court typically reviews . . . [contempt] sanctions for abuse of discretion." (citation modified)); *FTC v. Leshin*, 618 F.3d 1221, 1231 (11th Cir. 2010) ("We review the remedial relief granted as a contempt sanction for an abuse of discretion.").

But where a party forfeits its challenges to a civil contempt order like this one,[5] we will decline to address the forfeited arguments unless the party shows an

---

[5] MP PPH implies that the sanctions imposed by the trial court involved "punishment" and "vindication" and therefore should be categorized as criminal contempt sanctions. We presume that MP PPH meant to accuse the trial court of "vindictiveness" rather than "vindication," as the trial court's contempt order does not vindicate MP PPH.

In any event, MP PPH fails to demonstrate that the trial court's sanctions were punitive rather than coercive and compensatory. MP PPH's reliance on the magnitude of the ordered sanctions is unavailing, as the distinction between civil and criminal contempt sanctions does not turn on severity, but instead on whether the sanction has a remedial/coercive purpose in lieu of a punitive one. *See D.D.*, 550 A.2d at 44 ("[T]he sanctions for civil contempt are often drastic."). And MP PPH's suggestion that all civil contempt penalties must be "conditioned on future actions to bring a party into compliance" is incorrect—a trial court may order nonpurgeable civil contempt sanctions to compensate for the harm caused by the contemnor's

"exceptional situation[ ]" involving a "clear miscarriage of justice." *Plus Props. Tr. v. Molinuevo Then*, 324 A.3d 896, 903 (D.C. 2024); *see also Bronson v. Ann & Robert H. Lurie Child.'s Hosp. of Chi.*, 69 F.4th 437, 452 (7th Cir. 2023) ("[W]ith limited exceptions not applicable here, there is no plain-error review in civil cases."). Having carefully reviewed the record and the parties' arguments, we see no such clear miscarriage of justice. Accordingly, to the extent that MP PPH failed to properly preserve an argument (either before us or before the trial court), we will not address that argument.

## C.    Forfeiture

The District contends that MP PPH has forfeited the following arguments: (1) the trial court could not impose a complex-wide rent abatement without individualized evidence of harm from each Marbury Plaza tenant; (2) the trial court

---

noncompliance. *See United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 829 (1994); *Loewinger v. Stokes*, 977 A.2d 901, 923 (D.C. 2009).

As MP PPH offers no other argument as to either (1) how this court should distinguish remedial/coercive civil contempt sanctions from punitive criminal sanctions, or (2) why the trial court's sanctions—which it expressly designed to "coerce MP PPH's compliance with the consent order and, at the same time, to compensate the victims of MP PPH's noncompliance"—were nevertheless punitive, MP PPH has forfeited any further objections to the trial court's classification of the contempt proceeding. *See Gabramadhin v. United States*, 137 A.3d 178, 187 (D.C. 2016) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." (citation modified)). We thus treat the proceedings in this case as civil.

could not order contempt sanctions for the benefit of nonparties; (3) the trial court's rent abatement was impermissible because the contempt order did not explicitly state that rent abatements could be ordered as a remedy; (4) the contempt order "plainly violates numerous fundamental Constitutional rights"; and (5) the trial court improperly considered Dr. Pilavas's wealth when ordering sanctions.[6] MP PPH, for its part, states that "[e]very single argument on this appeal was presented to the Superior Court and preserved." Perhaps, suggests MP PPH, "the District's appellate counsel, who are different from the counsel that appeared for the District in the Superior Court, have not reviewed the record fully and are therefore unaware of all proceedings and filings below." We are disinclined to assume as much about counsel.

We agree with the District that MP PPH forfeited the arguments flagged by the District, except for MP PPH's final, wealth-related argument. To make this conclusion clear, we indulge ourselves in a brief primer on two principles that undergird our jurisdiction's forfeiture doctrine.

---

[6] In line with this court's recognition that we may consider "an unpreserved argument on the basis that the opposing party has not objected to us doing so," we do not address whether MP PPH has failed to preserve arguments not identified by the District as forfeited. *See Smith v. United States*, 283 A.3d 88, 98 (D.C. 2022).

First, our adjudicatory system is at its core a dispute *resolution* system. If we were to allow parties to raise new arguments after their initial forays[7] failed to persuade, no dispute would ever be resolved. *See Wical Ltd. P'ship*, 630 A.2d at 182 (grounding forfeiture doctrine in "the public interest in bringing litigation to an end after fair opportunity has been afforded to present all issues of law and fact" (citation modified)). Accordingly, "[q]uestions not properly raised and preserved [before the trial court], and points not asserted [there] with sufficient precision to indicate distinctly the party's thesis, will normally be spurned on appeal." *Id.* (citation modified).

Second, "[i]n our adversarial system of adjudication, we follow the principle of party presentation." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). Both "in the first instance and on appeal," therefore, "we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Id.* (citation modified). It follows that we will not on our own initiative address potentially meritorious arguments unless raised by the parties to a dispute—to do so would be to litigate a case in the parties' place. Put differently,

---

[7] Because in our system "trial and appellate processes are synchronized in contemplation that review will normally be confined to matters appropriately submitted for determination in the court of first resort," *District of Columbia v. Wical Ltd. P'ship*, 630 A.2d 174, 182 (D.C. 1993) (citation modified), a party's initial foray is limited to its time before the trial court.

our forfeiture doctrine in its most basic form bars us from addressing arguments either (1) not made or (2) expressed in such broad strokes that, to act on them, we must build out their foundation ourselves. *See Rose v. United States*, 629 A.2d 526, 535 (D.C. 1993) ("It is a basic principle of appellate jurisprudence that points not urged on appeal are deemed to be waived."); *Gabramadhin*, 137 A.3d at 187 (declining to reach an argument that the court deemed insufficiently developed).

The first three assertedly forfeited arguments (all of which relate to the propriety of across-the-board rent abatements as contempt sanctions) are in tension with both of the above principles. We begin with timeliness. Despite indications that the District was seeking—and the trial court intended to grant—rent abatements for tenants, MP PPH did not argue that such relief was either (1) always impermissible or (2) permissible only after individualized, tenant-by-tenant findings of harm until *after* the trial court issued its contempt order and imposed sanctions. Only then did MP PPH—in the form of a motion for reconsideration—raise for the first time its arguments relating to the propriety and calculation of the trial court's rent abatement. MP PPH, however, sees no problem with its approach. It contends that moving for reconsideration was sufficient to preserve its arguments for appeal, arguing that "the requirement is that the arguments be preserved—without a condition that they must precede the Superior Court's rulings."

MP PPH misapprehends the law of preservation. Motions for reconsideration are not "designed to enable a party to complete presenting its case after the court has ruled against it" and therefore "may not be used to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Dist. No. 1— Pac. Coast Dist. v. Travelers Cas. & Sur. Co.*, 782 A.2d 269, 278-79 (D.C. 2001) (citation modified). We give effect to the above proposition on appeal by, in most circumstances, treating arguments raised for the first time in a motion for reconsideration as forfeited. *See, e.g.*, *Jemison v. Nat'l Baptist Convention, USA, Inc.*, 720 A.2d 275, 282 (D.C. 1998) (deeming challenge to personal jurisdiction waived because it was not raised until a motion to reconsider); *Bostic v. D.C. Hous. Auth.*, 162 A.3d 170, 176 (D.C. 2017) ("In any event, even in the context of formal motions for reconsideration, claims raised for the first time on reconsideration are generally treated as forfeited."); *Williams v. D.C. Dep't of Pub. Works*, 65 A.3d 100, 110 n.51 (D.C. 2013) ("[A] motion for reconsideration, unless granted, will ordinarily not erase a party's waiver of an argument not presented to the adjudicator before entry of the final order on the merits . . . ."). We see no reason to depart from

our general rule in this case.[8]  MP PPH, by failing to raise its first three arguments until after the trial court issued its contempt ruling, has forfeited them on appeal.

Even if we were to overlook MP PPH's untimely presentation of its first three arguments, MP PPH has also forfeited its first three arguments for a separate reason: inadequate development.  MP PPH indicated in its notice of appeal that it was appealing in part from the trial court's denial of its motion for reconsideration.  Yet one reading the argument section of MP PPH's opening brief would be forgiven for missing this nuance—nowhere in its argument section does MP PPH address the standard of review associated with appeals from denials of motions for

---

[8] Our precedent (along with that from other jurisdictions) identifies some situations in which a departure from this rule may be warranted.  First, as we stated in *Plus Properties*, we always have the discretion to consider an unpreserved claim if doing so would prevent a clear miscarriage of justice.  324 A.3d at 903.  Second, if the "very nature of the error claimed" prevents a party from objecting before the entry of a judgment or order—e.g., if the error becomes apparent for the first time in the court's written order—a party will not be deemed to have forfeited the error on appeal by not objecting sooner.  *See Katz v. District of Columbia*, 285 A.3d 1289, 1314 (D.C. 2022).  Third, and finally, the Fifth Circuit deems new arguments raised in motions for reconsideration preserved "if the [trial] court addresses their merits." *See Catalyst Strategic Advisors, L.L.C. v. Three Diamond Cap. SBC, L.L.C.*, 93 F.4th 870, 875 n.1 (5th Cir. 2024).

But we discern none of the above circumstances with respect to the arguments raised for the first time in MP PPH's motion for reconsideration.  The record reveals no miscarriage of justice, statements by the District and the trial court should have put MP PPH on notice of the possibility of rent abatements prior to the trial court's formal finding of contempt, and the trial court did not engage with MP PPH's new arguments on the merits.

reconsideration, let alone explain why applying that standard reveals reversible error on the part of the trial court. Put simply, MP PPH has failed to develop an argument as to why the denial of its motion for reconsideration was error. We will not do so in its stead. *See Gabramadhin*, 137 A.3d at 187.

The same is true of the fourth assertedly forfeited argument—that "[t]he Contempt Order plainly violates numerous fundamental Constitutional rights." True, MP PPH in its opening brief references a specific provision—the Due Process Clause. But it makes only a paltry effort to explain how that provision—or indeed any others—was violated here.[9] And this absence of effort is particularly glaring given the uniform conclusion by courts that the imposition of compensatory and coercive sanctions by way of civil contempt proceedings—at which alleged contemnors like MP PPH receive notice and an opportunity to be heard—does not violate due process. *See, e.g.*, *Leshin*, 618 F.3d at 1239. We thus agree with the District that MP PPH has forfeited, through lack of development, any constitutional claims.

---

[9] MP PPH's citation to *DAKA, Inc. v. McCrae*, 839 A.2d 682, 697 (D.C. 2003) (holding that a punitive damages award twenty-six times greater than an associated compensatory damages award was unconstitutionally excessive), is unavailing because, as we explained above, MP PPH's arguments regarding the purportedly punitive nature of the trial court's sanctions are unpersuasive.

That leaves one argument—MP PPH's contention that the trial court improperly referenced Dr. Pilavas's wealth when determining what contempt sanctions to levy on MP PPH. The District suggests that this argument is "fatally perfunctory and undeveloped," but here it reaches too far. MP PPH both (1) identifies where in the record it contends the trial court considered the wealth of noncontemnors and (2) explains the legal rule that it claims the trial court flouted— the principle of corporate separateness. We view that as sufficient to preserve the argument.

With the issue of forfeiture resolved, we now address each of MP PPH's preserved claims of error in turn.

### D.     Sufficiency of the Evidence

MP PPH first contends that the District provided insufficient evidence to support the trial court's contempt finding, arguing that tenants' testimony at the evidentiary hearing was "inconsistent and contradictory" regarding, for instance, the condition of Marbury Plaza's swimming pool.

We are unpersuaded. Civil contempt is "a sanction designed to enforce compliance with an order of the court and to compensate the aggrieved party for any loss or damage sustained as a result of the contemnor's noncompliance." *D.D.*, 550

A.2d at 43. To establish civil contempt, the complainant must prove by clear and convincing evidence "that the alleged contemnor was subject to the terms of the court order[ ] and that he or she violated it." *Id.* "If the contemnor in [a civil contempt] proceeding has violated the mandate of the court, then his or her intent is immaterial, and a showing of good faith is of no avail." *Id.* at 44. "Indeed, we know of only two recognized defenses in civil contempt proceedings: substantial compliance and inability to do that which the court commanded." *Id.* (citation omitted).

Two examples suffice to uphold the trial court's contempt finding.[10] The trial court found—and MP PPH does not dispute on appeal—that MP PPH did not provide any extermination treatments until the District filed its renewed motion for contempt—treatments that were supposed to begin almost a year prior and continue monthly. And the trial court found—and MP PPH again does not dispute on appeal—that by the same date MP PPH had "remediated" only 18% of units in the

---

[10] Because statements by MP PPH's counsel and the trial court indicate that the consent order's start date was January 28, 2022, we reject MP PPH's repeated assertions that "[n]o verbal gymnastics can change the March 2, 2022 date of entry of the Consent Order." *See also J.G.G. v. Trump*, No. 25-766, 2025 WL 1119481, at *10-11 (D.D.C. Apr. 16, 2025) (explaining that the meaning of a court order depends not solely on when it is reduced to writing, but also on "the objective circumstances surrounding the issuance of the order," including its initial, oral announcement (citation modified)).

complex for mold, and in those had addressed only visible mold.  Because such paltry efforts do not come close to substantial compliance[11]—and MP PPH cannot realistically contend that it was impossible to arrange, for instance, extermination services[12]—the trial court did not err by holding MP PPH in contempt.

### E.  Interference with Other Courts

Second, MP PPH suggests that the trial court lacked the authority to order it to update its filings in pending Landlord and Tenant Branch cases to reflect the newly imposed rent abatement.[13]  This portion of the order, says MP PPH, implicates

---

[11] *See FTC v. Lane Labs-USA, Inc.*, 624 F.3d 575, 591 (3d Cir. 2010) (explaining that a party, to avail itself of the defense of substantial compliance, "must show that it (1) has taken all reasonable steps to comply with the valid court order, and (2) has violated the order in a manner that is merely 'technical' or 'inadvertent'").

[12] *See Coleman v. Newsom*, 131 F.4th 948, 960 (9th Cir. 2025) (explaining that the impossibility defense is not satisfied by a showing that "compliance would be difficult or expensive," but instead requires factual impossibility).

[13] MP PPH's remaining arguments go to the trial court's choice of sanction. And, because the District's entitlement to attorney's fees depends solely on the trial court's contempt finding, *see Link v. District of Columbia*, 650 A.2d 929, 933 (D.C. 1994)—and not on the ultimate sanction that it selected—one might wonder whether, now that we have affirmed the finding of contempt, MP PPH's remaining arguments are moot (recall that we concluded above only that this *case* was not moot because attorney's fees were at stake).  *See Robert v. Austin*, 72 F.4th 1160, 1163 (10th Cir. 2023) ("We . . . must decide whether a case is moot as to each form of relief sought." (citation modified)), *cert. denied*, 144 S. Ct. 573 (2024).

We proceed for two reasons.  First, it is not clear to us, after reviewing the limited record before us, that it is *impossible* for a ruling on the remaining arguments

issues of "*res judicata* and/or collateral estoppel" and amounts to "direct[ing] or limit[ing] the . . . discretion" of the courts presiding over those cases.[14]

We disagree on all counts.  In *Loewinger*, we adopted as our own an opinion by the trial court in which it required a contemnor landlord to appear at a hearing in another pending landlord-tenant case and "argue in favor of dismissal."  977 A.2d at 925.  *Loewinger* binds us as a division, and its application to this case is clear—it is

---

to mitigate to some degree the burden that the trial court's sanctions impose on MP PPH.  *Cf. Bradley v. District of Columbia*, 107 A.3d 586, 602 (D.C. 2015) (declining to find a case moot absent a "sufficient factual foundation to support [such] a determination"); *Ohio v. Madeline Marie Nursing Homes No. 1 & No.* 2, 694 F.2d 449, 464 (6th Cir. 1982) (refusing to deem a case moot despite the court's admission that it did "not know at th[at] point how Ohio may, in a practical way, get its money back" in ongoing bankruptcy proceedings).  Second, we have discretion to proceed even where a case may be moot.  *See Atchison v. District of Columbia*, 585 A.2d 150, 153 (D.C. 1991) ("[T]his court . . . enjoys flexibility in regard to mootness not possessed by the federal courts . . . .").  Because we conclude that interpreting a complex bankruptcy settlement negotiated by numerous parties not before this court worse serves the interests protected by mootness doctrine than does resolving the remaining issues on the merits, we exercise that discretion here.  *See Am. Fed'n of Gov't Emps. Loc. 872 v. D.C. Pub. Emp. Rels. Bd.*, 319 A.3d 977, 983 (D.C. 2024) (recognizing that "decisions about mootness ultimately seek to promote sound judicial economy" (citation modified)).

[14] We must admit that we are troubled by MP PPH's objection to this portion of the order.  MP PPH may only litigate if represented by counsel.  *Moore Energy Res., Inc. v. Pub. Serv. Comm'n*, 785 A.2d 300, 304 (D.C. 2001) ("[A] corporation cannot appear in court *pro se*.").  MP PPH's counsel in turn bears a duty to correct a "false statement of material fact or law" previously made to a tribunal.  D.C. R. Pro. Conduct 3.3(a)(1).  We therefore share the District's hope that MP PPH "surely does not mean to suggest that it would fail to disclose to the Landlord and Tenant Branch a material change in the amount of rent due absent the court's order."

within a court's power to order the contemnor to take action in other pending actions if necessary to effectuate the court's contempt sanctions. That is exactly what occurred here.

We also see none of the consequences about which MP PPH complains. Because the contempt order requires action only by MP PPH, it leaves the discretion of the courts presiding over MP PPH's landlord-tenant proceedings undisturbed. And as for MP PPH's concerns about collateral estoppel, the challenged provisions of the trial court's contempt order apply only to "any *pending* case." Accordingly, we see no way in which the contempt order upsets final judgments—any case in which final judgment has been entered necessarily is not "pending."

The trial court thus did not err by requiring MP PPH to update its filings in pending landlord-tenant cases to reflect the ordered rent abatement.

## F. Three-Step Procedure

MP PPH suggests that in every contempt proceeding in this jurisdiction, the trial court must follow a three step process: (1) issue an order to show cause; (2) if contempt is shown, issue a conditional order finding contempt and threatening a specified penalty absent compliance with purgation conditions; and (3) if compliance is not forthcoming, only then exact the threatened penalty. Because the

trial court imposed sanctions immediately after holding MP PPH in contempt, MP PPH reasons, reversal is required.

A review of our precedent reveals that the above process is not always required. True, we have expressed "no quarrel" with such a procedure in the context of coercive sanctions—for instance, where a party was withholding a document in derogation of a court order, we said that the prudent course was to give the party another chance to turn it over before ordering the party imprisoned. *D.D.*, 550 A.2d at 47. But we have multiple times since then affirmed contempt orders in which, after finding contempt, the trial court immediately imposed sanctions. *See Eisenberg v. Swain*, 233 A.3d 13, 18, 21 (D.C. 2020) (affirming single order both finding attorney in contempt and ordering reimbursement of garnished wages and compensatory damages); *District of Columbia v. Jerry M.*, 571 A.2d 178, 183 n.16, 191-92 (D.C. 1990) (affirming contempt order imposing, without providing additional time to come into compliance, prospective $100 per child and $1000 per day fines for violations of consent decree); *Fed. Mktg. Co. v. Va. Impression Prod. Co.*, 823 A.2d 513, 520, 536 (D.C. 2003) (affirming contempt order for $307,384.93 in compensatory damages for violation of consent order). A rigid, three-step contempt process is not *always* required where the sanction is designed in part to compensate the complainant for past or ongoing harm suffered due to the contempt.

In light of the above precedent, the trial court did not abuse its discretion via the procedure by which it held MP PPH in contempt. Regarding the trial court's decision to impose sanctions immediately, we see no reason why the trial court should have delayed providing compensation to those harmed by MP PPH's failure to live up to its commitments to improve the conditions at Marbury Plaza. And so far as procedural fairness is concerned, we note that the trial court gave MP PPH ample notice and an opportunity to be heard on the contempt issue: it ordered a round of briefing, held a motion hearing followed by a three-day evidentiary hearing, ordered still further briefing, and then held yet another hearing to allow the parties to give closing arguments. We see no reversible error.

## G. Dr. Pilavas's Perceived Wealth

Finally, MP PPH accuses the trial court of (1) discriminating against MP PPH based on its perceived wealth and (2) improperly considering the wealth of one of MP PPH's members—Dr. Pilavas—when evaluating MP PPH's ability to pay contempt sanctions.

We see no evidence in the record of discrimination by the trial court. An alleged contemnor's insolvency is relevant to both (1) raising an impossibility defense to a contempt finding (to the extent, of course, that the underlying order requires the expenditure of funds), *Huber v. Marine Midland Bank*, 51 F.3d 5, 10

(2d Cir. 1995), and (2) demonstrating that coercive financial penalties contemplated by the trial court are not "reasonable in relation to the facts," *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1353 (2d Cir. 1989).[15]  The alleged contemnor bears the burden of establishing its financial condition in both circumstances. *Coleman*, 131 F.4th at 959-60; *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 658 (2d Cir. 2004).  Because MP PPH attempted to avail itself of the latter avenue, the trial court had no choice but to inquire into MP PPH's finances.  References by the trial court to those finances, therefore, do not amount to wealth-based discrimination.

MP PPH's second argument, however, merits more attention.  The court, when rejecting MP PPH's argument that "costly sanctions [would] unfairly punish [it]," relied on the assets of MP PPH's members.  Specifically, it said:

> Mr. Pilavas only reluctantly shared information at the hearing about his family's real estate holdings and was not at all forthcoming about the extent of his family's wealth or its ability to invest additional funds in MP PPH to bring Marbury Plaza up to the requirements of the consent order. The record is clear, however, that the Pilavases have extensive real estate holdings—totaling more than 1,500

---

[15] This second defense is limited to coercive sanctions; "[f]or a compensatory contempt sanction, in contrast to a coercive one, inability to pay is no defense." *F.T.C. v. Leshin*, 719 F.3d 1227, 1234 (11th Cir. 2013).  But because the trial court here did not identify which portions of its chosen sanctions were coercive and which were compensatory, this distinction cannot save the trial court's sanctions calculation.

residential units and more than [forty] office suites in at least three states and the District of Columbia—and that they have repeatedly moved more than $10 million in and out of MP PPH seemingly whenever doing so advanced their investment purposes.

To understand why the above statement is problematic, some background on the law of corporations is necessary. "It is long settled as a matter of American corporate law that separately incorporated organizations are separate legal units with distinct legal rights and obligations"—"even if the entities are affiliated . . . by virtue of having a common owner." *Dewberry Grp., Inc. v. Dewberry Eng'rs Inc.*, 145 S. Ct. 681, 686-87 (2025) (citation modified). It flows from this principle of "corporate separateness" that, generally speaking, where one corporation loses a lawsuit, only that corporation—and not its separate owner or affiliates—bears the loss. *Id.*

The District argues that the trial court's references to Dr. Pilavas's other holdings—the corporate affiliates of MP PPH—did not violate the above principle, pointing out that the trial court held only MP PPH—not its members or affiliates— liable for contempt. *Dewberry Group*, however, reveals the flaw in the District's reasoning. It is just as much a violation of corporate separateness, the Supreme Court there explained, to levy a greater sanction on the defendant corporation based on the wealth of its corporate affiliates as it is to hold corporate affiliates liable for the defendant corporations' wrongdoing. *Id.* In both circumstances, the court treats separate entities "as one." *Id.* It follows from *Dewberry* that the trial court's reliance

on Dr. Pilavas's separate sources of wealth was error.[16]  Put simply, the trial court violated the principle of corporate separateness.

But not every error requires reversal.  "A lower court decision must be affirmed if the result is correct, despite the fact that the court relied on a wrong ground or gave a wrong reason."  *In re O.L.*, 584 A.2d 1230, 1232 n.6 (D.C. 1990) (citation modified); Super. Ct. Civ. R. 61 ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.").  Thus, if we are "fairly assured that the outcome would have been the same absent the error," we will not reverse.  *Sanchez v. Sundely LLC*, 322 A.3d 529, 539 (D.C. 2024).

The question we face, therefore, is whether, had the trial court not considered Dr. Pilavas's wealth, we can conclude with fair assurance that it would have determined that MP PPH's financial condition did not warrant a reduction in sanction magnitude.  We answer this question in the affirmative.  MP PPH bore the

---

[16] This is not to say that consideration of an owner's wealth in corporate contempt proceedings will always be error—quite the opposite is true.  First, a complainant may seek to hold an individual officer of a corporation jointly liable for the corporation's contempt on the theory that the officer was required to, and failed to, direct the employees of the corporation to comply with the court's order.  *See FTC v. Kuykendall*, 371 F.3d 745, 759 (10th Cir. 2004).  And second, a complainant may attempt to pierce the corporate veil to reach the assets of corporate shareholders.  *See Dewberry Grp.*, 145 S. Ct. at 687.  But because the District did not attempt either route here, "the demand to respect corporate formalities remains."  *See id.*

burden of showing that its financial condition justified a decreased coercive sanction. As the trial court elsewhere found, MP PPH did not meet this burden.[17]

To be sure, MP PPH put forward evidence that it was taking in decreased rental income (as reflected in its operating account balance) and bearing increased operating expenses. But these facts alone do not establish an inability to bear coercive financial penalties, as MP PPH could well hold other assets, possess other bank accounts, or have access to lines of credit. *See Paramedics Electromedicina*, 369 F.3d at 658 (concluding that the contemnor had not met its burden of showing financial incapacity even when it proved that it had lost approximately 20% of its sales, fired thirty employees, and closed all but one of its offices, as the contemnor "offered no documents—balance sheets, tax returns, income statements, or bank records—to show its financial incapacity"). Here, as in *Paramedics Electronica*, MP PPH nowhere provided financial documentation ruling out the above possibilities.

That fact alone might well have been sufficient for the trial court to decline to reduce its contemplated sanctions. *See id.* ("A contemnor's failure to provide financial information upon which the burden of a sanction may be evaluated may

---

[17] When evaluating whether MP PPH had violated its order, the trial court concluded that MP PPH "ha[d] not established it was 'powerless' to pay for [laundry room repairs] with its own funds, or through a loan if necessary."

not . . . result in a holding that the district court abused its discretion in imposing the sanction." (citation modified)).  But we need not rely solely on MP PPH's omission in the above regard, as evidence presented at the contempt hearing suggests that MP PPH indeed had additional financial levers to pull.  Regarding other assets, a representative from Marbury Plaza's property management company testified repeatedly that when the property faced shortfalls (presumably in its operating account), MP PPH was able to "backfill."  And as for loans, MP PPH had a history of accessing credit when needed—it both negotiated an escrow account with its lender to pay large, consent-order-related expenditures and secured millions of dollars through a refinance of Marbury Plaza in 2021.  The record, moreover, does not suggest that lenders' generosity had run out—to the contrary, Dr. Pilavas testified, when asked what MP PPH was doing to raise more funds, that he was optimistic that MP PPH would be able to (1) defer interest payments on previous debt and (2) obtain additional loans to pay for work at the property.  So far as the evidence before the trial court established, therefore, MP PPH was not in as dire straits as it would now like us to believe.

Given the above, we conclude that MP PPH's substantial rights were not affected by the trial court's reference to the wealth of its managing member, as after reviewing the evidence regarding MP PPH's financial capacity, we are satisfied that MP PPH far from met its burden to prove its inability to bear sanctions.  *See United*

*States v. Acambaro Mexican Rest., Inc.*, 631 F.3d 880, 883-84 (8th Cir. 2011) (affirming contempt sanctions despite the trial court's inquiry into the wealth of the defendant corporation's owner because other evidence—specifically, that the defendant was still operating restaurants and retained equity in the properties on which those restaurants rested—sufficed to show that the defendant corporation had not met its burden regarding inability to pay).  Accordingly, the trial court's disregard for the principle of corporate separateness, although erroneous, was harmless.  And as we discern no other preserved error by the trial court, we affirm both the trial court's contempt finding and its chosen sanctions.

### III.   Conclusion

For the foregoing reasons, the judgment of the Superior Court is affirmed.

*So ordered*.